## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| KENNETH JONES, | ) | |
| | ) | CASE NO. 5:14CV996 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Kenneth Jones ("Jones") challenges the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying his claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Title(s) II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

## I. Procedural History

On October 24, 2007, Jones filed applications for POD, DIB, and SSI alleging a disability onset date of December 3, 2004 and claiming he was disabled due to bipolar disorder; adjustment disorder with anxiety; acute panic disorder without agoraphobia; back and neck pain;

ankle pain; and, tingling/numbness in his foot.  (Tr. 230-239, 275.)  His application was denied

both initially and upon reconsideration. (Tr. 140-145, 148-160.)

Jones timely requested an administrative hearing, which was scheduled for March 22,

2010.  (Tr. 161-162, 164-168.)  Jones did not appear at his hearing, although his counsel was

present.  (Tr. 133-134.)  The Administrative Law Judge ("ALJ") thereafter dismissed Jones'

request for a hearing.  (Tr. 130-134.)  Jones requested review by the Appeals Council.  (Tr. 203.)

On October 20, 2011, the Appeals Counsel remanded Jones' case for further proceedings.[1]  (Tr.

135-138.)

Following remand, a different ALJ was assigned to Jones' case and a hearing was held on

September 19, 2012, during which Jones, represented by counsel, and an impartial vocational

expert ("VE") testified.  (Tr. 42-89, 208.)  On December 19, 2012, the ALJ found Jones was able

to perform a significant number of jobs in the national economy and, therefore, was not disabled.

(Tr. 23-35.)  The ALJ's decision became final when the Appeals Council denied further review.

(Tr. 1-5.)

## II.  Evidence

***Personal and Vocational Evidence***

Age forty-five (45) at the time of his administrative hearing, Jones is a "younger" person

---

[1]  In its remand order, the Appeals Council ordered as follows: "[T]he Administrative Law
Judge will determine whether the claimant has constructively waived the right to appear at a
hearing.  (HALLEX I-2-4-24 D.1.)  If the Administrative Law Judge determines that the
claimant has not constructively waived the right to appear at a hearing and finds that the
claimant has provided good cause for failure to appear, the Administrative Law Judge will offer
the claimant another opportunity for a hearing (HALLEX I-2-4-25 D.2.)  If the Administrative
Law Judge determines that the claimant has constructively waived the right to appear at a
hearing, he or she will proceed with any further action necessary to complete the record and
issue a decision."  (Tr. 137.)

under social security regulations.  *See* 20 C.F.R. § 404.1563(c) & 416.963 (c); Tr. 48-49.  Jones

has a 9th grade education and past relevant work as a hand driller; tractor-trailer truck driver;

concrete-mixing-truck driver; dump truck driver; metal fabricator helper; production assembler;

tow truck operator; and, drywall finisher.  (Tr. 49, 79-81; 282.)

***Relevant Medical Evidence[2]***

On January 10, 2008, Jones presented to Mary-Helene Massullo, M.D., for a consultative

examination.[3] (Tr. 442-450.)  At that time, he reported a history of injuries and complained of

pain in his neck, back and ankles.[4]  (Tr. 442-443.)  He denied use of any ambulatory device, and

stated he could walk one mile and was able to ascend and descend stairs.  (Tr. 443.)  On

examination, Dr. Massullo noted as follows:

> The gait was normal but slow.  He has vast inconsistencies.  He walked in a
> hunched over position.  He could stand fully erect and could walk fully erect but
> for the most part he walked in a straight forward position. The patient has no need

---

[2] Jones suffers from both physical and mental impairments.  Because they are not relevant to
the grounds for relief presented in his Brief on the Merits, the Court will not recount the
medical evidence regarding Jones' mental impairments herein.

[3]  The only medical records prior to January 2008 that relate to Jones' physical impairments
consist of a series of emergency room ("ER") records.  According to these records, Jones was
treated in the ER for right thumb pain in October 2005 (Tr. 367); a corneal foreign body in his
right eye in February 2006 (Tr. 368); a dog bite and left knee injury consistent with a strain in
March 2006 (Tr. 369-370); a foot strain in July 2006 (Tr. 371); and early facial cellulitis
resulting from an abscess in November 2006 (Tr. 372-373.)

[4] Jones reported the following injuries.  In the mid 1990s, he "was picked up by his brother who
insulted him and struck his head on the asphalt below."  (Tr. 442.)  He went to the hospital and
was given a neck brace.  He claimed during the examination that "he hears grinding when he
turns his head and he feels like someone is lifting his skull off his shoulders."  *Id*.  He also
claimed that, in 1995, he fell 15 to 20 feet from a tree and landed on his tailbone.  *Id.*  He stated
he did not receive medical treatment for this injury.  Finally, he reported that, when was 13
years old, he injured his right ankle while riding his bicycle.  (Tr. 443.)  He stated during the
examination that "the pain shoots up his foot and his leg doesn't want to bend.  It hurts from
the ankle to the toes."  *Id.*

for ambulatory aid.  The patient was able to grasp and manipulate with each hand.
The joints presented no heat, redness, thickening or swelling.  The patient was
very dramatic during range of motion testing.  There were no restrictions of
motion.

(Tr. 445.)  Dr. Massullo also noted no gross abnormalities in Jones' back, muscles or bones.  *Id.*

Dr. Massullo's impression was of tobacco, drug and alcohol abuse; "chronic arthralgia

cervical spine per patient with history of fusion and was told by a chiropractor he had broken it

and it fused together;" chronic back pain; "fracture of the tailbone per patient chiropractor said it

was fused;" chronic arthralgia left ankle per patient; chronic arthralgia of the tailbone per

patient; and, "patient claimed he is bipolar and manic depressive most probably in part

secondary to [his drug and alcohol abuse and] noncompliance with treatment."  *Id.*  She found

Jones "appears to be able to do work related activities such as sitting, standing, walking, lifting,

carrying, handling objects, hearing, speaking and traveling."  *Id.*

Shortly thereafter, on January 15, 2008, Jones sought chiropractic care with Roger

Wilhelm, D.C., for treatment of his neck and back pain.  (Tr. 385-388.)  Jones reported (1) neck

pain on the right side that radiated into his head and gave him headaches; (2) pain between the

shoulder blades that radiated around to the right side; (3) constant low back pain that radiated

into both legs to his feet; and, (4) pain in his tailbone that made it "very difficult for him to

stand."  (Tr. 385.)  On examination, Mr. Wilhelm noted that Jones "ambulated poorly and slowly

for pain."  *Id.*  He further observed that Jones "stood antalgic forward and could not straighten

his low back or look up without severe pain."  *Id.*  Mr. Wilhelm noted significantly reduced

ranges of motion in Jones' cervical and thoracic/lumbar spines, as well as pain to palpation in the

neck.  (Tr. 386-387.)

Jones underwent x-rays of his neck, and upper and lower backs.  (Tr. 388.)  The neck x-

4

ray revealed anterior weight bearing of the neck; C2 rotated right; degenerative C6 disc; and arthritis at C6-C7.  *Id.*  His upper back x-ray showed T6 tipped low on the left; right curvature in the thoracic spine; T8 tipped low on the right; mild arthritis in the mid-thoracic spine; and, old rib fractures of the left T4, right T6, T7 and T8 ribs.  *Id.*  Finally, his lower back x-ray showed his pelvis was low on the right; end plate fractures of L3 and L4; degenerative L5 disc; decreased opening for the L5 nerves; and, an old fracture of the sacrum.  *Id.*

Mr. Wilhelm diagnosed sciatica; brachial neuritis; thoracic spine pain; and, neck pain. (Tr. 387.)  He stated Jones has "degenerative discs in the neck and in the back that are causing increased pressure on the nerves" and noted "it is likely that he also has bulging or protruding disks that may need further imaging studies in the future."  *Id.*  Mr. Wilhelm recommended a regimen of conservative chiropractic treatments, including spinal manipulations, traction, stretching and strengthening protocols, and home icing.  *Id.*

Jones returned for chiropractic treatment on January 16, 2008.  (Tr. 427.)  The next day, Mr. Wilhelm completed a disability form, in which he opined that Jones had a two to three hour limitation for arm or leg tasks.  (Tr. 384.)  Jones returned for chiropractic treatments on January 18, 2008; January 21, 2008; January 23, 2008; January 28, 2008; February 4, 2008; February 11, 2008; and, March 4, 2008.  (Tr. 427-428.)  On March 18, 2008, Mr. Wilhelm completed another disability form.  (Tr. 422.)  Therein, he described Jones' gait as "antalgic forward and leaning to the right with right leg limp."  *Id.*  Mr. Wilhelm noted "moderate improvement (30%) with therapy" but observed Jones "has not followed through with the prescribed [treatment] plan."  *Id.* In addition, he offered that Jones was limited to using his extremities for functional tasks for one

hour at a time.[5]  *Id.*

On April 3, 2008, Jones presented to David Williams, R.N., PA-C, at Crystal Clinic Orthopaedic Surgeons for evaluation of his neck, shoulder, and lower back pain.  (Tr. 452-456.)  Jones reported chronic pain for over 20 years.  (Tr. 452.)  He described his pain as constant and rated it a 3 on a scale of 10.  *Id.*  Mr. Williams noted Jones "is very mobile from sitting to a standing posture and tends to stand with a flexed posture, both in neck and low back."  *Id.*  There was mild hypersensitivity to palpation in the lumbar paraspinal region down to the sacral area; muscle tightness; and, pain over palpation to the interscapular region centrally in the paraspinal musculature.  (Tr. 452-453.)  Examination also revealed "cervical motion and lumbar motion [] limited to less than 50% of normal motion without reproduction of appreciable localized pain in those areas."  (Tr. 453.)

Mr. Williams assessed degenerative disc disease of the cervical, thoracic and lumbar spines; low back pain; and, cervical pain.  (Tr. 453.)  He referred Jones for MRIs of his cervical and lumbar spines, which Jones underwent on April 28, 2008.  (Tr.  453, 458-461.)  The MRI of Jones' cervical spine revealed cervical spondylosis worst at C5/6, with involvement to a lesser extent at C6/7 and C4/5.[6]  (Tr. 458.)  The MRI of Jones' lumbar spine showed (1) mild diffuse

_____

[5] In the meantime, state agency physician Gary Hinzman, M.D., completed a Physical Residual Functional Capacity Assessment on January 30, 2008.  (Tr. 408-415.)  Therein, he concluded Jones was capable of lifting and carrying 50 pounds occasionally and 25 pounds frequently; standing and/or walking for about 6 hours in an 8 hour workday; and, sitting for about 6 hours in an 8 hour workday.  (Tr. 409.)  He found unlimited push/pull capacity and no postural or manipulative limitations.  (Tr. 409-411.)  This assessment was affirmed by Edmond Gardner, M.D., on May 14, 2008.  (Tr. 438.)

[6] Specifically, this MRI showed (1) "a posterior disc/osteophyte complex impress[ing] on the ventral aspect of the subarachnoid space" and suspected mild bilateral neural foraminal narrowing at C4/5; (2) a posterior disc/osteophyte complex contributing to effacement of the

posterior bulging at L5/S1; (2) minimal posterior disc bulging, degenerative facet hypertrophy, and minimal neural foraminal narrowing at L4/5; (3) mild diffuse posterior disc bulging at L3/4; (4) minimal posterior disc bulging at L2/3; and, (5) multiple Schmorl's nodes.  (Tr. 460.)

Jones presented to Scot D. Miller, D.O., at Crystal Clinic on June 10, 2008.  (Tr. 451.) Jones reported "minimal progression of pain symptoms."  *Id.*  Dr. Miller noted that "sensory examination of both upper and lower extremities is within normal limits including dermatomes C4 through T1 and L1 through S1."  *Id.*  Motor examination was all within normal limits, including 5/5 motor strength in all major motor groups.  *Id.*  Dr. Miller reviewed the MRI results with Jones and discussed operative and nonoperative treatment options.  *Id.*  Jones opted for nonoperative treatment.  *Id.*  Dr. Miller recommended physical therapy and a strengthening program.  *Id.*

The next treatment record for Jones' physical impairments is an ER report dated August 22, 2010.  (Tr. 463-465.)  On that date, Jones presented to the ER complaining of sharp tingling and paresthesia in his left arm.  (Tr. 463.)  He reported that "it feels like a pins-and-needles sensation and sometimes it is more intense but it is a daily event for him."  *Id*.  The ER physician noted that "[t]he paresthesias [Jones] is describing could be from a possible slipped disc in his neck or even more likely an entrapment syndrome, somewhat more distal.  On the brachial plexus.  At this point, it does not show any muscle weakness."  (Tr. 464.)  Jones was diagnosed with paresthesias and discharged.  (Tr. 464-465.)

---

anterior and posterior subarachnoid space and bilateral neural foraminal narrowing secondary to hypertrophic degenerative change at C5/6; (3) posterior disc bulging and spurring impressing on the ventral aspect of subarachoid space and bilateral neural foraminal narrowing secondary to hypertrophic degenerative change at C6/7; and, (4) a very small right-sided disc herniation "which produces no significant overall central canal stenosis" at C7/T1.  (Tr. 458.)

Jones returned to the ER on August 8, 2011, complaining of flank pain.  (Tr. 480-481.)
He reported a "dull, throbbing-type pain in his left flank region that radiates into his left groin."
(Tr. 480.)  Jones stated the pain had been constant over the past two days, and rated it a 2 on a
scale of 10.  *Id.*  Examination revealed minimal left paraspinal tenderness and a negative straight
leg raise.  (Tr. 481.)  Jones underwent a CT of his abdomen and pelvis, which showed colonic
diverticulosis.  (Tr. 481, 478.)  He was discharged with diagnoses of acute left flank pain
"suspect musculoskeletal in nature," and diverticulosis disease.  (Tr. 481.)

On October 16, 2012, at the ALJ's request, Jones presented to Michael R. Magoline,
M.D., for a consultative examination.  (Tr. 510-523.)  Jones complained of pain in both of his
legs; weakness on the left side of his body; and, neck pain radiating into his head resulting in
constant headaches.  (Tr. 521.)  He stated he used a cane to ambulate and took no pain
medication.  *Id.*  On examination, Dr. Magoline found Jones had limited range of motion of the
cervical spine with paraspinal muscle spasm present along the left side.  *Id.*  Examination of
Jones' lumbar spine revealed tenderness and paraspinal muscle spasm, as well as limited range
of motion and pain with lateral side bending and rotational and twisting maneuvers.  (Tr. 522.)
Dr. Magoline observed left-sided weakness in Jones' upper extremities; left-sided subjective
numbness in his hand; back pain with straight leg raising on the left hand side; left-sided lower
extremity weakness; and, subjective numbness in both of his feet.  *Id.*

Jones underwent x-rays of his thoracic, cervical, and lumbar spine as part of this
examination.  (Tr. 522.)  The x-ray of Jones' thoracic spine was normal.  *Id.*  The lumbosacral
spinal x-ray showed "multilevel lumbar degenerative changes with disc space narrowing and
anterior and posterior osteophyte formation along the vertebral bodies, as well as neural

8

foraminal narrowing."  *Id.*  Jones' cervical spinal x-ray revealed "multilevel degenerative changes primarily at C5-C6 and C6-C7," as well as neural foraminal narrowing.  *Id.*

Dr. Magoline found Jones had end-stage cervical and lumbar degenerative changes, and limited him to sedentary work.  (Tr. 522-523.)  Specifically, Dr. Magoline concluded Jones was capable of lifting and carrying up to 20 pounds occasionally and no weight frequently.  (Tr. 510.) He found Jones could sit for one hour without interruption, for a total of five hours; stand for one hour without interruption, for a total of 3 hours; and, walk for one hour without interruption, for a total of one hour.  (Tr. 511.)  Dr. Magoline specified that Jones required the use of a cane to ambulate and indicated use of a cane was medically necessary.  *Id.*  He estimated Jones could ambulate 30 feet without the use of a cane.  *Id*.  Additionally, Dr. Magoline opined Jones was limited to occasional overhead reaching; frequent handling, fingering, feeling, and pushing/pulling; and, occasional bilateral operation of foot controls.  (Tr. 512.)

With regard to postural limitations, Dr. Magoline found Jones could occasionally climb stairs and ramps and balance; but could never climb ladders or scaffolds, stoop, kneel, crouch or crawl.  (Tr. 513.)  He opined Jones could occasionally move mechanical parts and operate a motor vehicle, but should never be exposed to unprotected heights.  (Tr. 514.)  As for environmental limitations, Dr. Magoline concluded Jones could tolerate occasional exposure to humidity and wetness, but could never tolerate dust, odors, fumes, and pulmonary irritants; extreme heat or cold; or, vibrations.  *Id.*  Dr. Magoline found that the above limitations had lasted or will last for twelve consecutive months.  (Tr. 515.)

Finally, Dr. Magoline found Jones could walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at reasonable pace with

the use of a single hand rail; perform activities like shopping; prepare a simple meal and feed

himself; care for his personal hygiene; and, sort, handle, and use paper and files.  (Tr. 515.)

***Hearing Testimony***

    During the September 19, 2012 hearing, Jones testified to the following:

- He dropped out of school after the 9th grade because of "focus issues."  He was in regular classes and did not have problems with reading, writing, or basic math. (Tr. 49.)

- He lives alone in a third-floor apartment.  The building does not have an elevator, so he has to take the stairs.  He has difficulty and takes breaks every six to eight steps.  Before moving into the apartment, he lived in a homeless shelter.  He has an eight year old son.  He used to spend a lot of time with his son, but no longer has the opportunity to do so.  (Tr. 48, 59-60, 71.)

- He has worked many jobs in the past, including as a fabricator, laborer, drywaller, assembler, dump truck driver, and tractor trailer driver.  He currently works part-time for a family and community services agency.  His job responsibilities include moving bags of donated clothing; sweeping the floor; and, painting.  He has worked in this position for the last six months for approximately ten to fifteen hours per week.  He never works eight hours in a single day.  He usually works between two to four hours per day, and does not lift more than 15 to 20 pounds. (Tr. 50-58.)

- He experiences pain in his hips, neck, head, back and feet.  He described his hip pain as "like being shot in the hip with an arrow and having to walk around and be pleasant to everyone all day."  (Tr. 61.)  The pain extends from his hips "completely down through my knees, all the way to the bottoms of my feet like I've stepped on a nail."  (Tr. 61.)  This pain occurs daily and has been ongoing for the past five years.

- His neck pain is worse on the left side than the right.  It extends to the side of his face and "it's like taking an ink pen or pencil and shoving it straight in your nose, or taking a sewing needle and stuffing it up under your gums."  (Tr. 61-62.)  He also experiences headaches every day, particularly when he sits down.  (Tr. 63.) His headaches are like migraines, but he does not suffer from light or noise sensitivity.  (Tr. 63.)  Sometimes the pain is so bad that he cannot lift his head off the pillow.  (Tr. 72.)

- He also suffers from excruciating pain in his lower back.  (Tr. 62.)  He does not use a cane or other assistive device to walk.  (Tr. 50.)

- He has been prescribed Percocet in the past.  It helped take "some of the sharpness away" but did not completely resolve the pain.  He is not currently taking any pain medication.  (Tr. 60, 71.)

- He suffers from bipolar disorder and panic attacks.  When his bipolar "kicks in," he has "no patience, no time, no tolerance for anything and I become very verbally hostile, aggressive."  (Tr. 67-68.)  He becomes overwhelmed with panic and anxiety on a daily basis.  (Tr. 76.)  His panic attacks can last up to an hour.  When they occur, he has to "get away from all things and everything and just go someplace and try to calm down."  (Tr. 76.)  He has difficulty concentrating.  (Tr. 69.)  His bipolar disorder has "cost [him] a lot of jobs."  (Tr. 75.)

- He has suicidal thoughts but "my beliefs won't allow something like that."  (Tr. 69.)  He voluntarily submitted to in-patient psychiatric care on two occasions, most recently last year.  (Tr. 77.)

- He is not currently taking psychiatric medication.  His doctors wanted him to take medication for his bipolar disorder but "we were having a hard time figuring out what's going to work and what isn't because I would be having side effects or I just couldn't tell if it was doing anything at all, because I'm constantly miserable." (Tr. 65.)  Side effects from his medications include tingling in his face; experiencing a lack of focus; and, feeling "out of it."  (Tr. 74.)  He also feels it does not make sense for him to take psychiatric medication until he gets his physical pain under control.  (Tr. 65.)

- He sees an alcohol and drug counselor for his past substance abuse issues.  He has been sober for over a year, but smokes marijuana approximately three to five times per month, "sometimes more" depending on his pain level.  (Tr. 68.)  He does not use any narcotics.  He is addicted to nicotine, however, and smokes one to one and a half packs of cigarettes a day. (Tr. 69.)

- He can shower by himself and prepares his own meals.  He cleans his house and does laundry when he can.  He walks four blocks to the grocery store and does his own grocery shopping.  He takes the bus to work and to see his drug counselor.  (Tr. 66-67, 70.)

- He has no hobbies.  He does not read.  He watches television but "sitting is not something that [he does] well."  (Tr. 70.)  He has difficulty sleeping.  (Tr. 69.)

- He can sit for thirty minutes before having to change positions.  How far he can walk depends on his pain level.  When he walks to the grocery store, he has to stop and rest.  (Tr. 70.)

The VE testified Jones had past relevant work as a hand driller (unskilled, performed as light); tractor-trailer truck driver (semi-skilled, medium); concrete-mixing-truck driver (semi-skilled, medium); dump-truck driver (unskilled, medium); metal fabricator helper (semi-skilled, performed as light); assembler-production (unskilled, light); tow truck operator (semi-skilled, performed as heavy); and, drywall finisher (skilled, performed as light).  (Tr. 79-81.)

The ALJ then posed the following hypothetical to the VE:

Hypothetical number one, individual the same age, education, work experience as the claimant, this hypothetical person would be limited to– we'll start at medium [as] typically defined, simple routine repetitive task, in a static environment with infrequent workplace changes, and any changes that did occur would be explained and/or demonstrated.  No fast-paced strict production quotas, such as you find in a piecework setting.  Not responsible for the health or safety of others, and frequent interaction with others.  Any past work?

(Tr. 82.)  The VE testified such an individual could perform Jones' past relevant work as a dump truck driver and that there would be other jobs in the national economy that such an individual could perform as well.  (Tr. 82-83.)

The ALJ then added the following further limitation to the first hypothetical:

All right.   If I had to assume that the individual would be further unlimited to frequently climb ramps and stairs; occasionally ladders, ropes, and scaffolding; frequently balance, stoop, kneel, crouch, crawl, and they should avoid hazards such as unprotected heights and dangerous machinery, any past [work] would remain?

(Tr. 83.)  The VE testified such an individual would not be able to perform any of Jones' past relevant work, but would be able to perform the following jobs: laboratory equipment cleaner (medium, unskilled); hospital cleaner (medium, unskilled); and, salvage laborer (medium, unskilled.)  (Tr. 83-84.)

The ALJ then modified the first hypothetical as follows:

12

> If I modify the interaction set forth in hypothetical number one, to instead of
> frequent incidental to no contact or interaction with the general public and
> occasional superficial [sic] of coworkers and supervisors, superficial defined in
> situations in which a hypothetical person can work in close proximity with others
> but not engage in any type of negotiation, arbitration, direction, management,
> conflict resolution group attaining task?

(Tr. 84.)  The VE testified such an individual would be able to perform the three previously

identified jobs.  (Tr. 85.)

The ALJ then modified the above hypothetical from medium to light work.  (Tr. 85.)  The

VE testified such an individual could perform the following jobs: housekeeping cleaner (light,

unskilled); mail clerk (light, unskilled); and, photocopying machine operator (light, unskilled).

(Tr. 85.)  The ALJ then asked whether jobs would be available if the hypothetical person was

further limited to sedentary work.  (Tr. 86.)  The VE identified the following jobs: addresser

(sedentary, unskilled); document preparer (sedentary, unskilled); and, film touch-up inspector

(sedentary, unskilled).  (Tr. 86.)

At the conclusion of the hearing, the ALJ indicated he was considering sending Jones for

a physical evaluation because the record did not contain any recent medical notes.  (Tr. 88.)

Subsequently, Jones attended a State consultative examination with Dr. Magoline on October 16,

2012.  (Tr. 23.)  Dr. Magoline's report and medical source statement were received shortly

thereafter and submitted into the record prior to the ALJ's decision on December 19, 2012.  (Tr.

23.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

13

that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[7]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Jones was insured on his alleged disability onset date, December 3, 2004, and remained insured through June 30, 2008.  (Tr. 23.)  Therefore, in order to be entitled to POD and DIB, Jones must establish a continuous twelve month period of disability commencing between those dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

---

[7]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled.  For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## IV.  Summary of Commissioner's Decision

The ALJ found Jones established medically determinable, severe impairments, due to degenerative disc disease of the cervical and lumbar spine, chronic back pain, diverticulosis, bipolar disorder, adjustment disorder with depression, and cannabis dependency; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (Tr. 25-27.)  Jones was found incapable of performing his past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work.  (Tr. 28-35.)  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Jones was not disabled.  (Tr. 33-35.)

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d

15

762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL

16

2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. Analysis

### *RFC Assessment and Opinions of Dr. Magoline and Mr. Wilhelm*

Jones argues the ALJ's determination that he can perform a reduced range of light work is not supported by substantial evidence because the ALJ failed to properly evaluate the findings and opinions of Dr. Magoline and Mr. Wilhelm. (Doc. No. 14.) The Commissioner maintains the ALJ properly considered and evaluated these sources' opinions regarding Jones' physical impairments. (Doc. No. 17.)

The RFC determination sets out an individual's work-related abilities despite their limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC, based on all of the relevant evidence. *See* 20 C.F.R. § 416.946(c). "Judicial review of the Commissioner's final administrative decision does not encompass re-weighing the evidence." *Carter v. Comm'r of Soc. Sec.*, 2012 WL 1028105 at * 7 (W.D. Mich. Mar. 26, 2012) (*citing Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472 (6th Cir. 1982); *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. 2011); *Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 807 (6th Cir. 2008)).

### *Consultative Examiner Dr. Magoline*

Jones first maintains the ALJ erred in failing to accord "great weight" to Dr. Magoline's

opinion that Jones was limited to sedentary work. (Doc. No. 14 at 14.)  As noted above, Dr.

Magoline concluded Jones was capable of lifting and carrying up to 20 pounds occasionally and

no weight frequently.  (Tr. 510.)  He found Jones could sit for one hour without interruption, for

a total of five hours; stand for one hour without interruption, for a total of 3 hours; and, walk for

one hour without interruption, for a total of one hour.  (Tr. 511.)  Dr. Magoline specified that

Jones required the use of a cane to ambulate.  *Id.*  Additionally, Dr. Magoline opined Jones was

limited to occasional overhead reaching; frequent handling, fingering, feeling, and

pushing/pulling; and, occasional bilateral operation of foot controls.  (Tr. 512.)  With regard to

postural limitations, Dr. Magoline found Jones could occasionally climb stairs and ramps and

balance; but could never climb ladders or scaffolds, stoop, kneel, crouch or crawl.[8]  (Tr. 513.)

Jones argues that, although Dr. Magoline is not a treating physician and only examined

Jones on one occasion, the ALJ was nevertheless required to consider certain factors in assessing

Dr. Magoline's opinion regarding Jones' limitations, including the supportability of his opinion;

the consistency of his opinion with the record as a whole; and, Dr. Magoline's area of

specialization.  (Doc. No. 14 at 13.)  Jones argues the RFC determination that Jones can perform

a reduced range of light work is flawed because the ALJ failed to properly consider Dr.

---

[8] While this opinion does not align perfectly with the regulatory definition of "sedentary work" set forth in 20 C.F.R. § 404.1567(a), it appears overall to adhere more closely to the definition of sedentary work than to light work.  *Compare* 20 CFR § 404.1567(a) & Social Security Ruling ("SSR") 83-10, 1983 WL 31251 at * 5 (1983) (defining sedentary work as lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; sitting for a total of approximately 6 hours in an 8 hour workday; and, standing or walking for a total of no more than 2 hours in an 8 hour workday) *with* 20 CFR § 404.1567(b) & SSR 83-10 at *5-6 (defining light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds; standing or walking for a total of 6 hours in an 8 hour workday; and, intermittent sitting during the remaining time).

Magoline's opinion in light of these factors.

The Commissioner argues the ALJ properly considered Dr. Magoline's opinion, along with the rest of the medical evidence in the record.  (Doc. No. 17 at 9.)  She notes there is no heightened articulation standard for reviewing the opinion of a one-time consultative examiner such as Dr. Magoline.  Because the ALJ explicitly considered Dr. Magoline's opinion and provided several reasons for rejecting it, the Commissioner argues the ALJ complied with the applicable regulations and crafted an RFC that is supported by substantial evidence.

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  20 C.F.R. § 404.1527(e)(2)(i).  Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions.  *Id*.  When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions."  20 C.F.R. § 404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight.  *Id.*

Here, the ALJ thoroughly recounted the medical evidence regarding Jones' physical impairments, including his back and neck pain.  (Tr. 29-30.)  The decision discussed Jones'

examination by Dr. Magoline as follows:

> At the consultative examination of October 16, 2012, Mr. Jones reported severe pain, but he also admitted he was not taking any medication to manage his pain. He used a cane to ambulate. Examination showed limited range of motion of his cervical spine with pain. In addition, he showed some tenderness along the lumbosacral spine and some decreased range of motion with pain. He also showed left-sided weakness, which the examiner stated was "well-documented" even though the record does not support that allegation (23F). Although Mr. Jones appeared at the examination with a cane, he did not present with one at the hearing. Moreover, when asked, he testified that he did not use a cane at the hearing. In addition, he reported he walks to the store, uses public transportation and lives alone without any apparent help. (Hearing). MRI findings as referenced above, demonstrate mild findings. The record thus shows that Mr. Jones has had inconsistent treatment for the symptoms associated with his spinal problems. Moreover, there are significant gaps in treatment, all of which suggest his symptoms do not rise to disabling severity. Consequently, the consultative examiner's opinion is afforded little weight. Nonetheless, taking into consideration the objective medical findings, I find the record supports a finding that Mr. Jones is capable of performing light work with the other restrictions.

(Tr. 30.) The ALJ then addressed Jones' credibility, concluding that "[a] careful review of the record does not disclose sufficient objective evidence to substantiate the severity of the symptoms and degree of functional limitations by the claimant." (Tr. 31.) Specifically, the ALJ noted the "general lack of objective evidence to support [Jones'] subjective complaints;" the nature and extent of Jones' activities of daily living (including his ability to walk four blocks to the grocery store, part-time work record, and ability to live alone, drive, and take public transportation); and, Jones' inconsistent testimony regarding his alleged use of a cane and lack of money. (Tr. 31-32.)

The decision then considered the opinion evidence. (Tr. 32.) The ALJ accorded "some weight" to Dr. Massullo's opinion "because she personally examined Mr. Jones[;] her examination was mostly unremarkable[;] . . . [and] her opinion is generally consistent with the record as a whole and Mr. Jones' reported daily activities. (Hearing)." *Id*. The ALJ gave "little

20

probative weight" to the opinions of State agency, non-examining physicians Dr. Hinzman and
Dr. Gardner that Jones could perform medium work "because evidence received at the hearing
level suggests he is more limited." *Id.*

The ALJ then weighed Dr. Magoline's opinion as follows:

On October 16, 2012, Dr. Michael Magoline, a State consultative examiner,
opined Mr. Jones would be limited in his ability to perform any type of heavy
manual labor and would be limited to sedentary work only. He then opined Mr.
Jones could lift and carry up to twenty pounds occasionally, but could stand only
three hours total in an 8-hour workday. Further, he opined Mr. Jones could walk
a total of one hour. Moreover, he indicated that Mr. Jones required the use of a
cane to ambulate. He also opined Mr. Jones could only occasionally reach
overhead bilaterally and operate foot controls occasionally. He opined that Mr.
Jones could occasionally climb stair[s] and ramps and occasionally balance.
However, he indicated Mr. Jones could never climb ladders or scaffolds and could
never stoop, kneel, crouch or crawl. He also placed environmental limitations
such as no exposure to unprotected heights, extreme cold, extreme heat,
vibrations, dusts, odors, fumes and pulmonary irritants. Lastly, he opined Mr.
Jones could tolerate occasional moving mechanical parts, operating a motor
vehicle and humidity and wetness (23F). I give the opinion of Dr. Magoline little
weight because it is based on a one-time examination. Moreover, the doctor
apparently relied quite heavily on the subjective report of symptoms and
limitations provided by the claimant, and seemed to accept as true most, if not all,
of what the claimant reported. Yet, as explained elsewhere in the decision, there
exist good reasons for questioning the reliability of the claimant's subjective
complaints. (See page 8 of the Decision). Moreover, the doctor's opinion
contrasts sharply with the other evidence of record, which renders it less
persuasive.

(Tr. 32-33.)

The ALJ formulated the RFC as follows:

After careful consideration of the entire record, I find that the claimant has the
residual functional capacity to perform light work as defined in 20 CFR
404.1567(b) and 416.967(b) except the claimant can frequently climb ramps and
stairs and occasionally climb ladders, ropes [or] scaffolds. The claimant can also
frequently balance, stoop, kneel, crouch and crawl. The claimant must avoid
hazards such as unprotected heights and dangerous machinery. The claimant can
perform simple, routine and repetitive tasks in a static environment with
infrequent workplace changes and any changes that did occur would need to be

21

> explained and/or demonstrated.  The claimant cannot perform fast-paced strict production quotas such as would be found find [sic] in a piece work setting.  The claimant cannot be responsible for the health or safety of others.  Moreover, the claimant can tolerate incidental to no contact or interaction with the general public and occasional, superficial interaction with coworkers and supervisors.  Superficial is defined as situations in which they could work in close proximity, but not engaged in any type of negotiation, arbitrations, direction, management, conflict resolution or group or tandem tasks.

(Tr. 28.)

The Court finds the ALJ properly evaluated Dr. Magoline's opinion.  The ALJ discussed Dr. Magoline's examination findings and expressly acknowledged his opinions regarding Jones' physical limitations.  The ALJ stated that he ascribed "little weight" to Dr. Magoline's opinions and provided several reasons for his decision to do so.  Specifically, the ALJ noted that Dr. Magoline examined Jones on only one occasion and appeared to rely heavily on Jones' subjective reports regarding his symptoms and limitations.  The ALJ then explained that Jones' self-reported limitations contrasted with both the medical evidence (including the mild MRI findings from 2008) as well as Jones' own testimony at the hearing regarding his activities of daily living (including his ability to walk four blocks to the grocery store, live alone without help, and use public transportation).  Of particular relevance to the ALJ in this regard was Jones' inconsistent reports regarding his need for a cane.  Specifically, while Jones appeared at the hearing without a cane and expressly indicated he did not need one, he presented to Dr. Magoline just one month later with a cane.  (Tr. 521.)  These contradictions also formed the basis of the ALJ's credibility findings, which Jones does not challenge herein.[9]

---

[9]  Jones does not specifically argue it was improper for the ALJ to discount Dr. Magoline's opinion because it relied too heavily on Jones' subjective complaints.  Indeed, courts have held it is not error to assign little weight to a medical opinion when it is "based on a claimant's self reports which are themselves not credible." *Webb v. Comm'r of Soc. Sec.*, 2014 WL 129237 at

Thus, the ALJ acknowledged Dr. Magoline's opinion and articulated several reasons for discounting it, including its supportability and consistency with other evidence in the record.  As the Commissioner correctly notes, Dr. Magoline was not Jones' treating physician and, therefore, the ALJ was not required to satisfy the "good reasons" requirement in rejecting his opinion.  *See Taylor v. Colvin*, 2013 WL 6162527 at * 16 (N.D. Ohio Nov. 22, 2013) ("Notably, the procedural 'good reasons' requirement does not apply to non-treating physicians"); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) (explaining that "[i]n the absence of treating-source status for these doctors, we do not reach the question of whether the ALJ violated *Wilson* by failing to give reasons for not accepting their reports").  The analysis provided by the ALJ well satisfies the explanation requirements for non-treating, examining physicians.  Moreover, although Jones complains that the ALJ placed somewhat greater weight on the older, 2008 opinion of Dr. Massullo, Jones has not established that the ALJ erred in doing so, particularly in light of the ALJ's findings regarding the nature and extent of Jones' activities of daily living and his inconsistent reports regarding his need for a cane.

Accordingly, the Court finds the ALJ did not err in rejecting Dr. Magoline's opinion that Jones was limited to sedentary work.

### Chiropractor Wilhelm

---

* 6 (E.D. Tenn. Jan.14, 2014) (citing *Vorholt v. Comm'r of Soc. Sec.*, 409 Fed  App'x 883, 889 (6th Cir. 2011)).  *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007) (affirming ALJ's rejection of treating physician opinions where "[t]hese doctors formed their opinions solely from Smith's reporting of her symptoms and her conditions and the ALJ found that Smith was not credible"); *Stevenson v. Astrue*, 2010 WL 3034018 at * 8 (M.D. Tenn. Aug. 3, 2010) (finding that a medical opinion "based on [an] incredible self-report could reasonably be given insignificant weight by an ALJ when the credibility determination is based on substantial evidence").

Jones next argues the ALJ failed to address the opinions of his chiropractor, Roger Wilhelm, D.C.   As noted *supra*, Jones presented to Mr. Wilhelm for chiropractic treatment on nine (9) occasions between January and March 2008.  (Tr. 385-388, 427-428.)  After the first treatment, Mr. Wilhelm concluded Jones had a two to three hour limitation for arm or leg tasks. (Tr. 384.)  In March 2008, Mr. Wilhelm offered that Jones was limited in using his extremities for functional tasks to one hour at a time. (Tr. 422.)

Under Social Security regulations, only "acceptable medical sources" are considered "treating sources" whose opinions may be entitled to controlling weight.  *See* 20 CFR §§ 404.1502/416.902, 404.1513(d)/416.913(d),  and 404.1527(d)/416.927(d); Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 at * 2 (Aug. 9, 2006).  It is well-established that chiropractors, such as Mr. Wilhelm, are not "acceptable medical sources."  *See* 20 C.F.R. § 404.1513(a), (d).  *See also Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 530 (6th Cir. 1997); *Salah v. Comm'r of Soc. Sec.,* 2013 WL 3421835 at * 10 (N.D. Ohio July 8, 2013); *Kinney v. Comm'r of Soc. Sec*., 2000 WL 571923 at * 1 (6th Cir. May 4, 2000).  Rather, a chiropractor is an "other source" pursuant to 20 CFR §§ 404.1513(d)(1)/416.913(d)(1), which is neither entitled to controlling weight or subject to the "good reasons" requirement of the treating physician rule. *See* SSR 06-03p, 2006 WL 2329939 at * 2; *Walters,* 127 F.3d at 530; *Everett v. Comm'r of Soc. Sec*., 2012 WL 3731388 at * 11 (S.D. Ohio Aug. 28, 2012).

Nonetheless, evidence from "other sources" should not be ignored.  As explained in SSR 06-03p,  information from "other sources" (such as chiropractors) is "important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03P, 2006 WL 2329939 at * 2 -3 (Aug. 9, 2006).  Interpreting this SSR, the

Sixth Circuit has found that opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007) ("Following SSR 06-03P, the ALJ should have discussed the factors relating to his treatment of Hasselle's assessment, so as to have provided some basis for why he was rejecting the opinion"). *See also McKitrick v. Comm'r of Soc. Sec.,* 2011 WL 6939330 at * 12-13 (N.D. Ohio Dec. 30, 2011); *Kerlin v. Astrue*, 2010 WL 3937423 at * 7 (S.D. Ohio March 25, 2010).

In discussing the medical evidence regarding Jones' physical impairments, the ALJ thoroughly recounted Jones' course of treatment with Mr. Wilhelm.  (Tr. 29.)  The decision then considered Mr. Wilhelm's opinions as follows:

> Roger Wilhelm DC also provided several statements regarding claimant's work abilities.  In a questionnaire signed January 17, 2008 and in a second questionnaire dated March 18, 2008, he indicated that the claimant could only use his extremities for 2-3 hours.  (3F/1; 10F/2)  As discussed above, a chiropractor is not an acceptable medical source (20 CFR §§ 404.1513, 416.913(a); SSR 06-03p).  Nevertheless, I have considered these statements.  However, I find that they are entitled to little weight.  First, I would note that the claimant received limited treatment from Dr. Wilhelm, with no visits in the last few years.  Moreover, the statements are vague and inconsistent.  They are not supported by the MRI findings cited above, that reference mild findings. They are inconsistent with the relatively normal findings observed at the consultative exams.  Finally, they are inconsistent with the claimant's activities of daily living as previously listed.

(Tr. 33.)

The Court finds the ALJ properly evaluated Mr. Wilhelm's opinions regarding Jones' limitations in the use of his extremities.  As required by SSR 06-03p, the ALJ expressly considered the length of Jones' treatment with Mr. Wilhelm; the consistency of Mr. Wilhelm's opinions with the other medical evidence; and, "how well the source explains the opinion."

*Cruse*, 502 F.3d at 541. Indeed, the ALJ articulated a number of reasons for according little weight to Mr. Wilhelm's opinions, including that Jones had limited treatment with Mr. Wilhelm and, in fact, no visits with him in the four years preceding the hearing; that Mr. Wilhelm's assessment was inconsistent with the contemporaneous, mild MRI findings; and, Jones' own testimony regarding his activities of daily living. Based on the above, the Court finds the ALJ properly considered Wilhelm's opinions in accordance with the applicable regulations.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ properly assessed the opinions of Dr. Magoline and Mr. Wilhelm. Jones' argument that the RFC is not supported by substantial evidence because the ALJ failed to properly evaluate these opinions, is without merit.

### *Hypothetical*

Jones next argues the ALJ erred at step five of the sequential evaluation because "at no point were hypothetical questions posited that included the limitations identified by Dr. Magoline and Plaintiff's chiropractor." (Doc. No. 14 at 19.) As a result, Jones maintains the hypothetical posed to the VE did not account for all of his restrictions and, therefore, the ALJ "committed reversible error by relying on the testimony of the [VE] to determine that Mr. Jones can perform work, in significant numbers, in the national economy." *Id.*

The Commissioner asserts this argument is without merit because the ALJ reasonably concluded that the opinions of Dr. Magoline and Mr. Wilhelm merited little weight. (Doc. No. 17 at 16.) Therefore, the Commissioner asserts the ALJ need not have incorporated the limitations set forth in those opinions into his hypothetical questions. *Id.* at 16-17.

A hypothetical question must precisely and comprehensively set forth every physical and

26

mental impairment that the ALJ accepts as true and significant.  *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  Where the hypothetical question is supported by evidence in the record, it need not reflect unsubstantiated allegations by the claimant.  *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990).  In fashioning a hypothetical question to be posed to a VE, the ALJ is required to incorporate only those limitations that he accepts as credible.  *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (*citing Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  However, where the ALJ relies upon a hypothetical question that fails to adequately account for all of the claimant's limitations, it follows that a finding of disability is not based on substantial evidence.  *See Newkirk v. Shalala*, 25 F.3d 316, 317 (6th Cir. 1994).

Because the Court has found that the ALJ reasonably rejected the limitations set forth in Dr. Magoline's and Mr. Wilhelm's opinions, the ALJ need not have incorporated those limitations into the hypothetical questions posed to the VE.  Accordingly, Jones' argument that the ALJ improperly relied on VE testimony at step five is without merit.

## VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the decision is AFFIRMED.

IT IS SO ORDERED.


/s/ Greg White
U.S. Magistrate Judge

Date: March 26, 2015